UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:20-cv-00042-FDW-DSC

| | |
|---|---|
| GREAT STAR INDUSTRIAL USA, LLC and HANGZHOU GREAT STAR INDUSTRIAL CO., LTD., <br><br> Plaintiffs, <br><br> vs. <br><br> APEX BRANDS, INC., <br><br> Defendant. <br><br> APEX BRANDS, INC. and APEX TOOL GROUP, LLC, <br><br> Counterclaimants, <br> vs. <br><br> GREAT STAR INDUSTRIAL USA, LLC and HANGZHOU GREAT STAR INDUSTRIAL CO., LTD., <br><br> Counterdefendants. | ORDER |

THIS MATTER is before the Court on the Motion for Preliminary Injunction (Doc. No. 8) filed by Defendant Apex Brands, Inc. ("ABI") and Counterclaimants Apex Brands, Inc. and Apex Tool Group, LLC ("Apex Tool") (collectively, "Apex"). Apex requests the Court to preliminarily enjoin Plaintiffs and Counterdefendants Great Star Industrial USA, LLC ("Great Star USA") and Hangzhou Great Star Industrial Co., Ltd. ("Hangzhou Great Star") (collectively, "Great Star") from using an allegedly infringing name or mark in any way until the above-captioned case is

1

resolved. (Doc. No. 8-1, p. 1-2). For the reasons which follow, Apex's Motion (Doc. No. 8) is DENIED.

I. **BACKGROUND**

Great Star filed a Complaint for Declaratory Judgment of Non-Infringement against ABI on January 21, 2020. (Doc. No. 1). On February 19, ABI filed its answer denying Great Star's claims of non-infringement and validity, as well as a counterclaim against Great Star, which Apex Tool joined. See generally (Doc. No. 7). Apex filed the instant motion on the same day. (Doc. No. 8).

In the counterclaim, Apex asserted seven counterclaims against Great Star, including trademark infringement, cancellation of federal trademark registration, unfair competition, cybersquatting under the Anticybersquatting Consumer Protection Act, state law unfair competition under the North Carolina Unfair & Deceptive Trade Practices Act, common law trademark infringement, and common law unfair competition. See generally (Doc. No. 7). Apex's counterclaims are based on its allegations that Great Star unlawfully used a confusingly similar variation of Apex's common law trademark consisting of the word "GEARDRIVER" and a gear design. (Doc. No. 7, p. 9-11, ¶¶ 9, 10, 12, 13, 20).

Great Star filed its Response to Apex's motion, (Doc. No. 17), and its answer to the counterclaim, (Doc. No. 18), on March 4, 2020. Apex filed its Reply shortly thereafter, thereby making the motion ripe for review. (Doc. No. 19). The Court had originally scheduled a hearing on the motion for April 8, 2020, (Doc. No. 16), but in light of the rapid spread of the COVID-19 novel coronavirus, the Court vacated the hearing, (Doc. No. 21). The Court determined it could

rule on Apex's motion based on the briefs, and invited both parties to file a proposed Order containing findings of fact and conclusions of law. Id. at 1-2.

## II. FINDINGS OF FACT

Having considered Apex's Motion for Preliminary Injunction, Great Star's Response, Apex's Reply, and the exhibits and attachments to each document, the Court makes the following findings of fact:[1]

1. Hangzhou Great Star was established in 1993 and operates a machinery and hand tool enterprise. (Doc. No. 17-1, p. 2, ¶ 2-3). A significant portion of Great Star's marketing activities in the United States are conducted through Great Star USA. Id. at 2, ¶ 3.

2. Apex is a manufacturer of hand and power tools, serving the industrial, vehicle service and assembly, aerospace, electronics, construction, and do-it-yourself markets. (Doc. No. 8-2, p. 2, ¶ 2).

3. Apex and its predecessors in interest have used the composite mark ⊙**GEAR**DRIVER ("GEARDRIVER Design Mark") in commerce throughout the United States since at least 2003. Id. at 3, ¶ 7.

4. Apex obtained a federal registration for the GEARDRIVER Design Mark, which lapsed in 2017. Id. at 3, ¶ 8. Apex has, however, continued to use, on a continuous basis, the GEARDRIVER Design Mark on products sold in the United States. Id. at 3-4, ¶ 9.

5. Products bearing Apex's GEARDRIVER Design Mark are sold through retail stores including Home Depot and Lowe's and other online channels such as Amazon.com. Id.

---

[1] These findings of fact are based on the limited record before the Court and are not intended to be binding for purposes of ruling on dispositive motions that may arise and/or trial.

6. Apex sold over 18,000 units of GEARDRIVER products during 2019. Id. at 5, ¶ 16.

7. Apex's GEARDRIVER mark is inextricably linked to its GEARWRENCH brand. Id. at 5, ¶ 15. Apex spends millions of dollars per year on advertising on its GEARWRENCH brand, including a sponsorship of the No. 1 Chevrolet for Chip Ganassi Racing in the NASCAR Cup Series, which is currently driven by Kurt Busch, thereby exposing the brand to many viewers. Id.

8. The GEARDRIVER Design Mark is used prominently on products and product packaging. See generally (Doc. No. 8-4).

9. From 2016 to March 2019, Great Star manufactured a GEARWRENCH hand tool tote bag for Apex, which was in accordance with the standards and specifications provided by Apex. (Doc. No. 17-1, p. 2, ¶ 4).

10. In 2015, Great Star developed new ratcheting screwdrivers and mechanical tool products (the "GEARDRIVE hand tool products") with which Great Star has since continuously used the GEARDRIVE designation. Id. at 3, ¶ 6.

11. Great Star chose the GEARDRIVE designation because it was based on Great Star's success with its DOUBLEDRIVE tools. Id. at p. 3, ¶ 7.

12. In Q2 of 2018, Great Star sold 41,872 units of GEARDRIVE hand tool products to Lowe's. Id. at 4, ¶ 9. In Q4 of 2019, Great Star sold 58,224 units of GEARDRIVE hand tool products to Home Depot. Id. Customer review ratings for GEARDRIVE products range between 4.5 and 5 stars out of 5 stars, and approximately 1 percent of Amazon reviews have been negative. Id.

13. Since at least May 2015, Great Star has used the designation  (the "GEARDRIVE & Circular Gear Design Mark") as one of the trademarks for its hand tools. Id. at 4, ¶ 10.

14. Great Star owns a federal trademark registration for the GEARDRIVE & Circular Gear Design Mark, namely, Registration No. 5,676,681, which pertains to the use of the mark on various hand tools. Id. at 5, ¶ 11.

15. That registration issued after the United States Patent and Trademark Office ("USPTO") examined Great Star's application for registration, searched its records, and "found no conflicting marks that would bar registration." Id. at 5, ¶ 12 (quotation omitted).

16. The USPTO published Great Star's application for registration of the GEARDRIVE & Circular Gear Design Mark on September 11, 2018, allowing any interested entity the opportunity to challenge the registration. Id. at 6, ¶ 12. After no party opposed the application, the USPTO issued registration of the GEARDRIVE & Circular Gear Design Mark to Great Star on February 12, 2019. Id.

17. Since at least January 2017, Great Star has also used the mark shown below ("GEAR DRIVE & Bisected Gear Design Mark"; together with the GEARDRIVE & Circular Gear Design Mark, "GEARDRIVE & Gear Design Marks"), as another trademark for its hand tool products:



Id. at 6, ¶ 13.

18. Great Star owns a federal trademark registration for the composite GEAR DRIVE & Bisected Gear Design Mark, namely, Registration No. 5,453,697, which covers use of that mark on hand tools and other goods. Id. at 7, ¶ 14.

19. That registration issued after the United States Patent and Trademark Office ("USPTO") examined Great Star's application for registration, searched its records, and found no conflicting marks that would bar registration. Id. at 8, ¶ 15.

20. The USPTO published Great Star's application for registration of the GEAR DRIVE & Bisected Gear Design Mark on February 6, 2018, allowing any interested entity the opportunity to challenge the registration. Id. After no party opposed the application, the USPTO issued registration of the GEAR DRIVE & Bisected Gear Design Mark to Great Star on April 24, 2018. Id.

21. Apex first became aware of Great Star's GEARDRIVE & Gear Design Marks in November 2019. (Doc. No. 8-2, p. 4, ¶ 11).

22. In December 2019, ABI sent Hangzhou Great Star a letter asserting Great Star's usage of the GEARDRIVE & Gear Design Marks infringed on Apex's rights in designations of "GEARDRIVER" and "GEARWRENCH." (Doc. No. 1-6, p. 2). The letter demanded Great Star surrender its above-referenced registrations, remove all GEARDRIVE products from commerce, online and retail, destroy all inventory of GEARDRIVE products, and agree "to refrain from future use of any mark comprised of the word 'GEAR' in any way." Id. at 4.

23. A search on Lowes.com for "geardriver" returns one result, whereas a search for "ratcheting screwdriver" returns at least seventeen results. (Doc. No. 19, p. 3).

24. There are at least four documented instances of consumer confusion between GEARDRIVE and GEARDRIVER products on Amazon.com. (Doc. No. 8-1, p. 12-13).

**III. CONCLUSIONS OF LAW**

A preliminary injunction is an extraordinary remedy, the primary function of which is to protect the status quo and "to prevent irreparable harm during the pendency of a lawsuit." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). Courts evaluating a request for preliminary injunction "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 542 (1987). A party seeking a preliminary injunction must establish the following four factors: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

**A. Likelihood of Success on the Merits**

To succeed on a trademark infringement claim, a plaintiff must show that it owns a valid and protectable mark, that the defendants used a "re-production, counterfeit, copy, or colorable imitation of that mark in commerce without [the plaintiff's] consent," and that the use of the mark is likely to cause confusion. Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007) (quotation omitted).

1. Valid and Protectible Mark Used Without Consent

The first inquiry as to whether Apex is likely to succeed on the merits is if Apex has a valid and protectible mark. It is settled law that "[t]rademark ownership is not acquired by federal or

state registration. Ownership rights flow only from prior use." Flying Pigs, LLC v. RRAJ Franchising, LLC, 757 F.3d 177, 182 (4th Cir. 2014) (alterations in original). "'Neither application for nor registration of a mark at the federal level wipes out the prior nonregistered, common law rights of others.'" Daniel Group v. Service Performance Group, Inc., 753 F. Supp. 2d 541, 546 (E.D.N.C. 2010) (quoting 2 McCarthy on Trademarks and Unfair Competition § 16:2 (5th ed. 2020 update)).

To have a protectible trademark interest in an unregistered designation, the party must use the designation in commerce, and the mark must be distinctive. Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359, 363 (4th Cir. 2003). To be "used in commerce," the mark must "accompany[y] services rendered in commerce, i.e., it is employed appurtenant to an established business or trade that is in commerce." Id. at 364. Some marks can be inherently distinctive, namely those which are "fanciful," "arbitrary," or "suggestive." Sara Lee Corp. v. Kayser-Roth, 81 F.3d 455, 464 (4th Cir. 1996). "Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product." Id. On the other hand, some marks are not inherently distinctive but instead describe the function, use, or intended purpose of the product. Id. Such descriptive marks receive protection only if they have acquired a secondary meaning; in other words, the term must primarily identify the source of the product. Id. (noting that Coca-Cola® is "probably the paradigm of a descriptive mark that has acquired a secondary meaning"). The Fourth Circuit employs a six-factor test, none of which are dispositive, for the acquisition of secondary meaning: (1) a plaintiff's advertising expenditures, (2) consumer studies linking the mark to a source, (3) sales success, (4) unsolicited media coverage of the plaintiff's business, (5) attempts to plagiarize the mark, and (6) the length and exclusivity

of the plaintiff's use of the mark. George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 395 (4th Cir. 2009); see also Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125 (4th Cir. 1990). Notably, a generic term "can *never* be [a] trademark[]," id. (emphasis in original), and courts are generally to view the USPTO's decision in issuing a registration as evidence of a mark being descriptive, suggestive, or generic, Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 934 (4th Cir. 1995).

There is no question that the GEARDRIVER Design and Mark is used in commerce, meeting the first prong of the test for protection of an unregistered designation. On the distinctiveness issue, this case presents a very close call on whether the GEARDRIVER Design and Mark is inherently distinctive or descriptive with secondary meaning. It is not "fanciful" or "arbitrary," so in order to be inherently distinctive, the GEARDRIVER Design and Mark must be "suggestive." Sara Lee, 81 F.3d at 464. Based on the record to this point, Apex does not meet its burden of proving the mark is suggestive. Although the USPTO issued registration of the GEARDRIVE & Gear Design Marks to Great Star, thereby providing prima facie evidence the term is neither generic nor descriptive without secondary meaning, see Lone Star Steakhouse, 43 F.3d at 934, the GEARDRIVE & Gear Design Marks are not at issue in this motion, and the Court is hesitant to transpose the USPTO's ruling on a similar name and mark to a different name and mark at the preliminary injunction stage. Accordingly, the USPTO's decisions regarding Great Star's GEARDRIVE & Gear Design Marks are not sufficient evidence that Apex's GEARDRIVER Design and Mark is suggestive. Similarly, the Lowes.com search results for "geardriver" (one result) versus "ratcheting screwdriver" (at least seventeen results) is indeed evidence that "GEARDRIVER" is used to describe a type of screwdriver. Due to the truly

extraordinary nature of the preliminary injunction, however, the Court does not find a search of one retailer's database alone sufficient evidence. This is not to say such evidence cannot (in conjunction with a more developed record) support an ultimate conclusion the GEARDRIVER Design and Mark is suggestive, but at the preliminary injunction stage, there is not enough evidence for Apex to meet its burden.

Nor is there sufficient evidence, at this point, to support a finding that the GEARDRIVER Design and Mark is a descriptive term having acquired secondary meaning. Of the six-factor test to develop secondary meaning, there is only limited evidence supporting some factors. Although Apex contends it "has spent millions of dollars each year in advertising, marketing, and promoting its GEARWRENCH brand, including subbrands such as GEARDRIVER," (Doc. No. 8-2, p. 5, ¶ 15), the dispute at issue pertains specifically to the GEARDRIVER Design and Mark—of which there is not specific evidence as to the advertising expenditures of that brand. Apex does demonstrate sales success with the GEARDRIVER brand, as highlighted by its sale of over 18,000 GEARDRIVER products in 2019, id. at 5, ¶ 16, and it has also demonstrated the use of the GEARDRIVER brand since 2003 and the registration of the GEARDRIVER Design and Mark in 2006, id. at 3, ¶ 7-8. The record is devoid of evidence about consumer studies linking the mark to a source, nor is there currently evidence of unsolicited media coverage. Finally, although Apex contends Great Star adopted the GEARDRIVE & Gear Design Marks in bad faith, see (Doc. No. 8-1, p. 11-12), without other evidence in the record, this is distinguishable from an attempt to plagiarize. Although two factors favor a finding of a secondary meaning, the absence of evidence in the record as to the other factors counsels against making a finding at this point. The Court

again reiterates this is a close call, but the burden on Apex in establishing it has met the requirements for a preliminary injunction means it does not prevail at this point.

2. Likelihood of Confusion

The second inquiry as to the success on the merits requirement is whether Great Star's use of the GEARDRIVE & Gear Design Marks is likely to cause confusion. The Fourth Circuit employs a nine-factor test to ascertain the likelihood of confusion: (1) the distinctiveness of the senior mark; (2) the similarity of the marks; (3) the similarity of the products the marks identify; (4) the similarity of the facilities used by the parties to conduct business; (5) the similarity of the advertising; (6) the defendant's intent in adopting its mark(s); (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the product's consumers. Sara Lee, 81 F.3d at 463 (discussing the seven factors from Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir. 1984) and articulating the eighth and ninth factors). Not every factor applies in every case, nor is each factor to be weighed equally. Id. The Court addresses each factor below.

i. Distinctiveness of the Senior Mark

The first factor of the confusion analysis is the distinctiveness of the senior mark. Id. As the Court has addressed distinctiveness in Section III(A)(1) above, it declines to do so again here. The Court notes the distinctiveness inquiry is very close, but given the burden is on Apex, this factor weighs against granting a preliminary injunction.

ii. Similarity of the Marks

In considering the similarity of the marks, courts "focus on the dominant portions of the parties' marks. In other words, [they] focus on whether there exists a similarity in sight, sound, and meaning which could result in confusion." George & Co., 575 F.3d at 396 (citations omitted);

see also Sara Lee, 81 F.3d at 465 (holding that "L'eggs®" and "Leg Looks®," whether written or spoken, are similar). Additionally, "greater weight [is] given to the dominant or salient portions of the marks." Lone Star Steakhouse, 43 F.3d at 936. Here, the names of the products are nearly identical, both in appearance and phonetically, save for the final "R" in "GEARDRIVER" as opposed to "GEARDRIVE." By the same token, all three marks (the GEARDRIVE & Gear Design Marks and the GEARDRIVER Design Mark) each feature the name of the product—GEARDRIVER or GEARDRIVE—as well as a gear design feature. This factor therefore weighs in favor of finding confusion.

iii. Similarity of the Products

The third factor is the similarity of the products on which the marks are used. E.g., Sara Lee Corp., 81 F.3d at 463. Here, there is no dispute that all three marks at issue are used on and in conjunction with the sale of hand tools, including ratcheting screwdrivers. This factor therefore weighs in favor of a finding of confusion.

iv. Similarity of the Facilities

The fourth factor, the similarity of the facilities used by the parties in conducting their businesses, weighs in favor of finding a likelihood of confusion. See id. Both parties sell their products in retail stores such as Home Depot and Lowe's, and online websites such as Amazon.com. The fact the products compete directly against one another makes this factor lean in favor of finding a likelihood of confusion.

v. Advertising

The fifth factor is the similarity of the advertising used by the parties. E.g., Sara Lee, 81 F.3d at 463. In this case, the record does not contain much evidence about either party's

advertising, with the exception of Apex's discussion of advertising for its GEARWRENCH brands and subbrands, such as GEARDRIVER—namely, the expenditure of millions of dollars per year and NASCAR Cup Series sponsorship of the Chip Ganassi Racing No. 1 Chevrolet. This discussion, however, is limited to the larger GEARWRENCH brand, and evidence of Great Star's advertising practices is scant at best. Considering the burden on Apex to prove success on the merits is likely, and due to the insufficiency of evidence in the record at this point, this factor weighs slightly against finding confusion. At best, it is neutral.

vi. Great Star's Intent

The sixth factor of the likelihood of confusion analysis is the defendant's, or in this case, the nonmovant's, intent. E.g., Pizzeria Uno, 747 F.2d at 1527. Apex alleges Great Star acted in bad faith by not attempting to register the GEARDRIVE Gear & Design Marks until after Apex's registration expired, see (Doc. No. 8-1, p. 12), which, in light of the proximity of the two companies (the companies are headquartered less than five miles apart), see id., and the fact that Great Star performed manufacturing work for Apex prior to the expiration of Apex's registration in 2017, is not an altogether implausible inference. However, and as the Court noted in its findings of fact above, Great Star adopted the GEARDRIVE designation based on its success with its DOUBLEDRIVE product line. As Apex has provided no other evidence of malintent by Great Star other than its inference, this factor weighs against a finding of confusion.

vii. Actual Confusion

The seventh factor, that there is actual confusion, is not necessary to show a likelihood of confusion, but it can provide persuasive evidence. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 156 (4th Cir. 2012). "Actual confusion can be demonstrated by both anecdotal and survey

evidence," but "[e]vidence of only a small number of instances may be dismissed as *de minimis*." George & Co., 575 F.3d at 398. In George & Co., the Fourth Circuit affirmed a district court ruling that four instances of actual confusion amounted to *de minimis* confusion. Id. at 398-99. Here, Apex has provided evidence of four instances of actual confusion, each coming from reviews on Amazon.com. At this point, and without further evidence of actual confusion, this factor weighs against a likelihood of confusion.

viii. Quality of Great Star's Product

The eighth factor, the quality of the defendant's (or again, in this case, the nonmoving party's) product, is neutral here. Although Apex contends "Great Star's products are not high quality professional-grade tools," (Doc. No. 8-1, p. 13), Great Star has provided evidence that its products rate highly based on customer reviews, including 4.5 and 5-star rankings (out of a possible 5 stars) and having negative reviews of about 1 percent on Amazon.com. The lack of any other evidence on this point weighs against a likelihood of confusion.

ix. Sophistication of Customers

The ninth and final factor, the sophistication of the consuming public, is typically "only be a key factor when the relevant market is not the public at large." Sara Lee, 81 F.3d at 467. As the parties here sell their products to major home improvement retailers, such as Lowe's and Home Depot, as well as on websites such as Amazon.com, this factor is neutral.

In light of the foregoing analysis, the Court finds more factors weigh against finding a likelihood of confusion than in favor. The Court reiterates that this is a close call, but because the burden is on Apex in establishing the likelihood of confusion requirement, Great Star prevails.

Accordingly, Apex has not established a likelihood of success on the merits, and is not entitled to injunctive relief at this point.

**B. Irreparable Harm**

The second requirement for a party to obtain a preliminary injunction is whether that party is likely to suffer irreparable harm without preliminary relief. Winter, 555 U.S. at 20. As the party must establish all four factors, however, see id., and as Apex here has not demonstrated a likelihood of success on the merits, the presumption of irreparable injury does not apply. PGI Polymer, Inc. v. Church & Dwight Co., Inc., No. 3:15-cv-00214-FDW-DSC, 2015 WL 5920013, at *4 (W.D.N.C. Oct. 9, 2015) (noting that the presumption has not been altered by the Supreme Court's decision in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)).

Even though the Fourth Circuit has held "regardless of any potential injury to sales or to the mark itself, trademark infringement primarily represents an injury to reputation," Lone Star Steakhouse, 43 F.3d at 939, the Court is not convinced any injury to Apex would be irreparable. The GEAR DRIVE & Bisected Gear Design Mark was issued by the USPTO in 2018 and the GEARDRIVE & Circular Gear Design Mark was issued in early 2019; moreover, Great Star used the GEARDRIVE & Gear Design Marks for several years prior to Apex's discovery. The Court believes any injury to Apex's reputation would likely have been evident much sooner than several years after the fact, and there is not currently evidence that Apex's reputation has suffered in the interim. Second, Apex moved for a preliminary injunction, but not a temporary restraining order. This further indicates that any injury to Apex will be reparable during the course of this litigation. Finally, the Court will expedite the litigation here by placing this case on its "Fast" case

management track, leading to a relatively quick resolution of this legal dispute.[2]  Given the combination of these facts, the Court believes any harm suffered by Apex will be reparable and therefore does not justify the use of an extraordinary judicial remedy.

### C. Balance of Equities and Public Interest

The third and fourth requirements to be granted a preliminary injunction are whether the balance of equities tips in the moving party's favor and whether a preliminary injunction would be in the public interest.  Winter, 555 U.S. at 20.  As discussed above, because Apex does not show a likelihood of success on the merits or irreparable harm, the Court does not reach discussion of the third and fourth requirements.

### IV. CONCLUSION

For the foregoing reasons, Apex's Motion for Preliminary Injunction (Doc. No. 8) is DENIED.  The Court will follow this order immediately with a Case Management Order.

IT IS SO ORDERED.

Signed: April 13, 2020

_____
Frank D. Whitney
Chief United States District Judge

---

[2] The Court will follow this Order with a Case Management Order.